Good morning, and may it please the Court. My name is Jason Rylander. I represent Defenders of Wildlife in the Senate. Mr. Rylander, let me ask you a question to start with. On June 2, 2008, Fish and Wildlife issued a preliminary finding. It's a petition by you to have the pygmy owl, Arizona pygmy owl, listed as an endangered species, and these presented substantial, in quotes, information that the listing may be warranted. And they began a review of the status of the Arizona pygmy owl. Now, if that review eventuates in a listing of the Arizona pygmy owl as an endangered species, is that not exactly the remedy you wish from this Court? That result, Your Honor, would lead to this case being at least prudentially moot. That petition did ask for a number of different iterations of the taxon to be listed. If it would be prudentially moot, shouldn't we be prudent and at best suggest that you take this matter to mediation? With respect, Judge Bea, we do not know what the Fish and Wildlife Service will ultimately decide. We do think that the issue of whether the Arizona population was improperly delisted from the Act is alive before this Court. This Administration has listed very few species. The time for listing sometimes, although the statute states that the agency has one year to finalize its recommendations on a positive finding, that is often not met. We don't know how long it will take the Fish and Wildlife Service to ultimately decide. Could I just interrupt and ask, didn't, you know, in 2003, this Court directed remand and directed Fish and Wildlife to further analyze the significance issue in this case? And, of course, they went through a fairly lengthy process of doing that. It's recounted in Judge Bolton's ruling and the like. And they had the best science, the best evidence that was available to them at the time. And I perceive, perhaps incorrectly, that this latest petition suggests that there's more. You know, there's something new. There's something else that should be considered by Fish and Wildlife in making its determination. So going back to Judge Bea's question, why wouldn't we defer to that ongoing process rather than proceed with ruling on the matter now before the Court? Well, Your Honor, I think there are three reasons. The first, which I alluded to before, is that there's an element of time. The species in Arizona, all parties agree, and this Court has previously found, is critically endangered and could easily blank out in the time that it takes. I'm not hearing you, sir, because. . . I understand. I'll try to speak a little bit more loudly. The Arizona population is critically endangered, and there's really no dispute about that. In the time that it may take the Fish and Wildlife Service to revisit the listing, there could be further damage to the pygmy owl. There are other answers that I would give, Your Honor, and that is that, in fact, a lot of the evidence that the Fish and Wildlife Service had before it in reaching this new 90-day finding was also before the service at the time that it delisted the owl. Most of the basis for the 90-day finding comes from the published work of Dr. Glenn Proudfoot, which has reviewed the genetic significance of the variety of populations of pygmy owls. Doesn't he have a new study that was not available to the Fish and Wildlife when they issued the delisting rule? My understanding is that the only difference between what the service had for the 90-day finding and what it had before them before was that those studies have since been published. They announced in the rule that they wouldn't rely on anything that hadn't been published. I would argue that there's no basis for that determination, because the Endangered Species Act requires that the best available science be used. Publication in peer-edited journals may be a sufficient answer to that. Publication in peer-reviewed journals certainly does go to the credibility and reliability of the studies that are before the service, but the service is allowed to consider whatever it happens to be before it, including its own field surveys and the field surveys of others who have presented evidence to the service on the basis of listing. What the record shows is that Dr. Proudfoot had submitted information related to his findings that the eastern and western population of the pygmy owl was genetically distinct from one another. How does that affect your case? It was my assumption going in that the eastern and western populations were distinct. That is, the Texas and Arizona owls were different. My understanding of our prior ruling was that this really wasn't an east-west problem. It was a north-south problem. It was really a question of whether the Arizona population represented a significant population in the Sonoran Desert area between Mexico and Arizona. The former decision in this case was primarily a ruling about the Fish and Wildlife Service's decision only to compare owls in Arizona to owls in Texas. And the homebuilders note this in their brief as well. The Fish and Wildlife Service failed entirely to investigate the status of the owls in Mexico. And what this Court found was not that the relationship with the United States was irrelevant, but that under the DPS policy, the requirement is that the service must also look to the taxon as a whole. And so looking at the taxon as a whole required there to be an analysis not just of differences between Arizona and Texas, but between Arizona and the rest of the population, which includes the eastern pigmy owls going down south from Texas and then back up the western population through Sinaloa and Sonora and then ultimately to Arizona. So if the – what the service had before it in 1997 was preliminary genetic evidence that suggested differences between the eastern and western populations. The Ninth Circuit referred to those as potential but not actual differences. What the service has before it now are actual differences of a magnitude that would suggest both the eastern and western populations should be separate subspecies. And that's the latest Proudfoot study. Is that the subject of your petition, or is this – or is that different? That is – that is in part the subject of the petition, but that information was also before the Court – I'm sorry, before the Fish and Wildlife Service at the time that it made its delisting decision. Now, Dr. Proudfoot's studies are in the record at – let's see. Well, there's a number of studies, but Proudfoot and Slack 2006, which had been accepted for publication in 2005, is in the record at 2811. And there are also letters from Dr. Proudfoot to Fish and Wildlife Service's lead biologist, Scott Richardson, which provide a memorandum of his findings, which were presented because of the publication was – he was still waiting for the finishing of his dissertation and publication of that and the other studies. But that information was clearly presented and did represent the best available science under the Endangered Species Act. It's important also because had the service taken that into consideration, it would have dramatically changed the way it did its significance analysis of the Arizona population. Because the DPS policy requires a consideration of the taxon as a whole, if you change the taxon, then quite naturally the population at issue is going to take on a greater percentage of significance, both in terms of the historic area, the current area of the species, and it may have a different analysis as well in terms of the genetics and the fact that it occupies an unusual or unique habitat area. So we do think this is a critical error. And it is interesting that really all of the information before the service for the 90-day finding was also before the service at the time that it delisted the pygmy. And that really is part of what's fundamental about our case. Your voice is dropping again, counsel. I'm sorry. I'm saying that that is one of the, all of the evidence that was before, all the substantive evidence that was before the Fish and Wildlife Service for the 90-day finding this year was also before the service in 1990, was also before the service at the time that it delisted the owl, and that is really at the heart of our argument, that the service's determination is unreasonable here. How are we to compare? I mean, you're talking about what was just given to provide the basis for the 90-day finding, and you're saying it included that which FWS had, which Fish and Wildlife had previously in 2005. Is there something more before the Fish and Wildlife that resulted in this 90-day study? Or is it simply the same thing regurgitated? I mean, we don't, none of that, that's not in the record, is it? Well, the petition that we filed is certainly not in the record. Right. What you do have is the 90-day finding and the studies that it cites. A number of the studies that it cites are, predate the delisting decision. I guess what I'm misunderstanding, are you saying that FWS has changed its mind, that they said one thing in the matter that was presented before Judge Bolton based upon what they had, and the only difference is it's since that date Proudfoot and Slack have been published, or are you saying that there is something more? To my knowledge, the only substantial difference is that the research that Dr. Proudfoot presented during the comments on the delisting rule have since been published. Another thing that the delisting, I'm sorry, another thing that the 90-day finding notes is that in the delisting rule, the service said that it was not going to consider reevaluating the taxon, because the American Ornithologist Union had not at that point changed its definition of subspecies. It turns out that the American Ornithologist Union has not updated its list of subspecies since 1957, and it acknowledges now in the 90-day finding that the, that that is, oops, this is it, that that is in fact the case. It says that the service is not restricted to existing taxonomic checklists in determining a listable entity. Rather, the service is required to use the best available scientific information, scientific and commercial information, and it cites Dr. Proudfoot's work and also work of Koenig from 1999, which surely was also before the Fish and Wildlife Service. I remain unclear as to why the Fish and Wildlife Service believes that it has the ability to redesignate the taxon now, but it did not have that desire to do so and explains no, gives no reason in the delisting decision as to why it didn't at least consider that at the time that it delisted the pygmy owl. That's rather difficult for us to understand also on the record that we have. Does that augur in favor again of what Judge Beyer raised at the beginning, that mediation might be not only viable, but preferable in this situation? Again, I think that may depend on what the government's position is with respect to protecting the pygmy owl in the interim. I have no personal experience with mediation. It's my understanding that the 90-day letter is entered or issued, I may be using the term wrong, there is no coterminous with that, no injunction or action that preserves the status quo pending the 12-month study? The 90-day finding in and of itself under the Endangered Species Act provides no affirmative protections to the species at issue. In fact, the Fish and Wildlife Service still has the ability to change its mind prior to issuing a 12-month finding. And as I noted, the 12-month findings, although that's required under the Act, are often not actually issued within 12 months, which only adds to the specter of delay for a species that numbers, a population that numbers in the dozens in Arizona and is subject to increasing threats to its habitat and survival. If the service were willing to relist the owl on an interim basis, then of course that would or were able to issue its 12-month finding sooner, then this case could be disposed of, I suppose. But in the absence of that, we are left with a critically endangered population that is without protections because the service has applied its significance criteria in a manner that is, I think, internally inconsistent and also inconsistent with the goals and purposes of the Act, and that's what we've argued. One of the other issues that the service, I think, erred in, in looking at the significance of the pig meow in Arizona, is that even if it had used this broader taxon comparing the, that included both the eastern and western populations, it was then required to determine that the Arizona population was, it had to compare it to the taxon as a whole. And when you're looking at whether the Arizona population occupies a unique or unusual setting for the taxon, the Arizona owls occupy a Sonoran Desert habitat. Desert sand scrub habitats make up about 20% of the complete taxon of the pig meow. The rest of the pig meows in the world tend to exist in more forested habitats. The common definitions of unique and unusual would suggest that desert habitats are unusual for pig meows. But the service found that the Arizona population was not unique or unusual simply because it looked only at the owls that were most adjacent and contiguous to it in the same desert habitat. It did not look to the broader taxon as a whole, did not look at owls in Texas, owls in eastern Mexico, owls in southern Mexico below Sinaloa. Now, we'd have to find that if they were to do so, they acted arbitrarily and capriciously, would we not? That is correct. And how was their action or what they looked at arbitrary and capricious or capricious? Well, I think you have to look to the plain language of what unique and unusual mean. And in this instance, it appears that the service conflated those two separate words into one meaning. They used the international boundary, which they are allowed to employ under the DPS policy for to help delineate species more as a matter of administrative convenience to diminish the significance of a population that occupies an unusual habitat area for pig meows under any definition. The species and the habitats aren't confined by boundaries that are drawn. So is that really unusual that they would do so? Well, the species and habitats aren't confined especially by boundaries. That's correct, Judge Proe. But the issue of whether pig meows occupy, that occupy desert habitats are in an unusual setting. It strikes me as undeniable. And the fact that the service is using the international border to, you know, segment it as a means of aiding listing in one respect and then at the same time use it to diminish importance on the other side is quite curious. I also just want to say a word or two before reserving time about some of the other issues that we have raised in this case. We believe that in general the application of the significance criteria here has been too rigid and that when it has been applied rigidly as it has to diminish the potential for listing a species that are among the last in America, that that does raise issues with respect to the consistency with the Endangered Species Act. There's quite a bit in the briefs that tries to suggest that we are making a facial challenge to the policy and we are not. That issue, I think, has been foreclosed by the Court's prior opinions. We are simply stating that the significance criteria when you look at the purpose of the DPS policy as a whole and the purposes of the Endangered Species Act is intended to allow protection and recovery, I'm reading from the policy now, of declining organisms in a more timely and less costly manner and on a smaller scale than might be needed to recover an entire species or subspecies. And there can come a point where the criteria is applied in so stringent a manner that the purposes of the act are frustrated. I'd like to reserve the remainder of my time for rebuttal. Okay. Thank you, Counsel. Good morning, Your Honors. May it please the Court. Charles Scott on behalf of the Fish and Wildlife Service. The point of this case is that the Fish and Wildlife Service has been sued for explicitly complying with this Court's prior remand opinion on how it must apply the DPS policy to the Arizona Pygmy Owl. The challenge is foreclosed by precedent as binding precedent, not to mention the law of the case doctrine. I think I should probably first address before getting into my argument the effect excuse me, I should also make clear, given the posture of this case, the government has chosen to divide its time with the Home Builders Association evenly. So I will speak for 10 minutes and leave the rest of the time to Mr. James. We submitted a 28-J letter, including the June 90-day finding, to inform the Court of a development that may moot the case at some point. However, the 90-day finding is a totally separate action. The 2006 delisting rule is to be reviewed on the basis of the administrative record before the agency, not the 28-J letter, not Mr. Rylander's phone call to the American Ornithologist Union about when taxonomy is revised. The another point is that the 28-J letter does not make a finding as to whether listing is warranted. It says that there is substantial information suggesting that listing may be warranted, and it invites the public to submit additional information on the question. This Court has characterized it as a preliminary finding. It is a lower standard than the warranted finding that is ultimately required for listing. And I believe, although I am not certain what the contents of the record on which the 28-J letter were, because that is not the record at issue in this case. Help us to understand what the effect. I understand now about the lower burden of proof and so on, on the 90-day finding. The 90-day finding is 90 days of what? The statute requires that on receipt of a listing petition, the service make a finding within 90 days to the extent practicable as to whether the petition presents substantial information that listing may be warranted. And if listing may be warranted, if there is substantial information, the service will then proceed to undertake a full-blown 12-month analysis, including solicitation of new information. The 90-day finding is based on the petition, I believe. At this point, under your rules, you had 90 days to respond to Defender of Wildlife's petition? To the extent practicable, Your Honor. Which you did or did not do? The finding was issued on June 2, 2008. The petition was received in March 2007. In the interim, as we note in our brief, it was an action that was assigned for completion during the financial year, but for which there were no budgetary resources. So it took you about 15 months. It's probably not actionable. The bottom line is that you have now issued a response to the Defender of Wildlife's petition. Correct. On a different record and imposing a lower standard. And this now imposes upon you a burden to conduct a 12-month study, at the end of which you may or may not decide to propose a listing of the pygmy owl. To be faithful to the text of the statute, Your Honor, the finding is supposed to be made within 12 months of the receipt of the petition. At the moment, the Fish and Wildlife Service has received the petition and has begun soliciting information. If I'm not mistaken, the Defenders of Wildlife and Home Builders Association are submitting information on this petition, and they can correct me if I'm wrong. But this is an ongoing process to obtain what is the best available science now. However, it is separate from what was the best available science in the administrative. All right, I want to make sure I'm right. You had 12 months from your time in June, and at the end of that 12 months you're supposed to do what? To issue a finding on whether the listing is warranted, whether listing is warranted but precluded by other listings of other species. If you conclude that it's not warranted, then we're right where we are right now, and we need to decide this case. I think that — I would say that that's not certain, Your Honor. If the analysis in the 90-day finding — excuse me, the 12-month finding of not warranted complies with the analysis that the court has previously required and what Defenders of Wildlife have asked for, that is all the relief that the court may grant. Courts in the Administrative Procedure Act context may not impose the substantive outcome of agency rulemaking. The question is whether the process is arbitrary and capricious. So although the relief that the Defenders of Wildlife may ultimately be seeking is to have the pygmy owl listed, it is possible that their case could be mooted by a finding that listing is warranted or warranted but precluded or possibly even not warranted, depending on the nature of the analysis. Scalia. Now, what's the status of the owl right now? Is it listed? Is it delisted because of the agency action in 2005 in Judge Bolton's ruling, or is it kind of in limbo pending either this Court's ruling or what occurs? The owl was delisted in 2006. The owl is not listed under the Endangered Species Act presently. If at the end of the 12-month period you decided that listing was warranted, do you have to start the listing process all over again? Do you submit it out for comments and then have to publish a rule? Or at the 12-month, if you decide it's listed, then it's listed? The 12-month determination is accompanied by a proposed listing rule. And then so then you solicit comments again and propose a final rule? Yes. So if you're going to list the pygmy owl, we are some substantial period out before it gets listed. I do not know what the status of the petition is. In the ordinary way in which these things get done by agencies, you are likely to take the full 12 months. Even if you got it done within 12 months, that would be June of 2009. If you decided to propose a listing, then you're going to submit it out for proposals and you can be on whatever track you want to for listing the owl. I believe that's correct, Your Honor. There is the possibility of an emergency listing rule, although I don't think that's the case. Which still would take months. The bottom line is that before the owl can be listed under the new proposal, under the new petition, we are a year to two years out at minimum. That is a reasonable characterization, Your Honor. I would like to get back to some of the other issues presented. One of the issues Mr. Reilander brought up was that the taxonomy of the pygmy owl should have been considered as proposed by Dr. Proudfoot. That is not what the best available science requirement requires. In 2001, Dr. Proudfoot obtained information indicating a marked genetic difference between the eastern and western populations of the pygmy owl. That information, to my knowledge, has not really changed since 2001. There have been additional publications. There was a dissertation written that was subsequently published in a peer-reviewed journal. But Dr. Proudfoot himself, in his 2005 comments to the agency, acknowledged that the taxonomic classification of the pygmy owl is contentious and disputed. 50 CFR 424.11 requires the agency first to look at established taxonomic distinctions in determining whether something qualifies as a species. The recognized authoritative body on this is the American Ornithologist Union. They recognize one subspecies of cactus pharyngitis pygmy owl covering Texas, Arizona, northeastern Mexico, and northwestern Mexico. The service determined, as it was entitled to do in the face of possibly conflicting evidence, that the proper taxonomic classification at the time of the rule was to compare the Arizona pygmy owl, to require it to be significant to the cactus pharyngitis pygmy owl taxon as a whole. That is also what this Court's opinion specifically required. The ultimate argument that defenders make here is it was arbitrary and capricious for Fish and Wildlife Service to consider significance to the taxon as a whole. But that is precisely what the Court instructed the agency to do. Furthermore, to the extent that this argument is supposed to be broader and is an argument that the listing is inconsistent or an unreasonable interpretation of the Endangered Species Act, that is the exact same issue that was addressed by this Court in the Northwest Ecosystem Alliance case involving the gray squirrel. There the Petitioners said, we have a discrete population, it is imperiled, and but for the significance requirement, you should have listed it. They challenged, as the Court recognized, the existence of the significance to the taxon requirement. That is the text of the DPS policy. It is the very existence of the significance requirement, not some sort of discretionary application in the context of this case to which defenders object. And yet, in the district court, they represented that they were not challenged in the general validity of the significance requirement. But that must be the issue they have. And were that their argument, had they not waived it, it is an argument that this Court previously considered in its panel opinion. The Fish and Wildlife Service said there is a significant, there will be a significant gap in the range of the taxon as a whole if the Arizona population is lost. Because the western population will have been extirpated from the United States, and that violates the ESA's policy of conserving genetic diversity in the United States. Now, although the Court did not explicitly say, we disagree with this interpretation of the ESA, it certainly implicitly rejected the argument in instructing the service on how to apply the policy. Finally, the argument is foreclosed by the Northwest Ecosystem case, in which the DPS policy was found entitled to Chevron deference, and that its significance requirement was determined to be a reasonable interpretation of the Endangered Species Act. In fact, the court in Northwest Ecosystem specifically rejected three of the arguments that defenders of wildlife are making here, namely that reliance on a 1979 Senate report was improper, that there was a conflict with a term significant portion of its range, and that the FWS had in the past applied the policy inconsistently. As we've shown in our brief, the policy has been applied to list populations in the United States, even when their taxa are more abundant abroad, but provided, as Congress directed, that those United States populations are significant to the taxon as a whole. The determination to delist the pygmy owl was rationally based on the record for the agency at the time, and was reached in compliance with this Court's prior remand order, and it should be affirmed. And if there are no further questions, I'll yield my time to Mr. James. Thank you, Mr. Scott. Mr. James. May it please the Court. My name is Norman James. I'm counsel for the Home Builders Associations, and I've been involved in this case since the complaint was originally filed back in 2000. Let me start out by briefly touching on the mootness issue. My view is slightly different. I debated filing a letter responding to the government's 28J letter. Unfortunately, this case has got some complications that make it a bit unusual, as your questions, I think, recognize. First, with respect to the new petition, and I think you've addressed this, but just so it's clear for the record, you're absolutely right. It's going to take 18 months to two years before there's a final decision regarding the new petition. Remember, just because there's a proposed listing rule filed, say, next summer, doesn't mean that there will be a final rule published. There will be more comments. It's going to take a while. The second complicating factor, though, that the other counsel haven't mentioned to you is where we are with respect to this case. Remember, all that happened on remand was the Fish and Wildlife Service went back and did the analysis it was supposed to do with respect to the DPS policy's significant requirement. Remember, there are three steps. First, is the population discreet? Second, is it significant to the taxon as a whole? And then, what is its conservation status? Does it merit listing as a threatened or endangered species under Section 4? Well, the only thing the Fish and Wildlife Service did, Your Honors, on remand was go back and reconsider the population significance. If you were to reverse, speaking hypothetically, if you were to reverse today and send it back, the species wouldn't be subject, at least this would be our position, the pig meow wouldn't be, quote, relisted. Because what you would have, even if you ruled as a matter of law, based on the record, that the population is significant to the taxon as a whole, you'd end up with a very bizarre mismatch of scientific information. You would have a discreteness determination based on scientific data through 1996. You'd have a significance determination based on data through April 2006. Then you would have a conservation status determination, again, based on data through 1996. We would argue that in order to list the species, you've got to look at the current conservation status of the species. I won't go through this in detail today, but as we explained in our brief, for obvious reasons, we know an awful lot more about the pig meow today than we did in 1996. The original listing rule, I used 1996. The original listing rule was published in March of 1997. The record gets cut off. So it's effectively pre-1997 data is a lot different. There was supposed to be a 150-mile gap south of the border. There were only two known populations in Arizona, one in northwest Tucson and a few owls in Northern Pipe Cactus National Monument. We now know that there were owls in other locations in southern Arizona, and most of those locations are in areas that are protected, such as the Tohono O'odham Indian Reservation, Oregon Pipe Cactus National Monument, two wildlife refuges. A lot of the other land is either administered by the BLM or in state ownership. So the point I'm trying to make is, with respect to the mootness issue, if you were to resolve the appeal in favor of defenders of wildlife today, it doesn't automatically mean that this species is relisted. We'd have to go back and start from square one when we'd have to look at the current status of the species and argue. In fact, frankly, in our view, what should have happened on remand is the agency should have gone back and looked at the administrative record in existence at the time it made its decision in early 1997, as opposed to going on and creating a new administrative record. They reached the right result. My clients weren't injured by that, Your Honors. But if they had reached the opposite result, I wouldn't be here today arguing that the process that was followed took into account information that didn't match up with the rest of the information. Did they do what we told them to do? Did they follow the --? Were we clear in the remand directing what? You're saying what they should have done. Well, I'm saying what they should have done, Your Honor, from the standpoint of basic administrative law. This Court remanded --- this Court said that the listing rule, the 1997 listing rule, was arbitrary and capricious and remanded for further proceedings consistent with the order. We filed a motion to vacate or to, well, to set aside, to enter to --- excuse me. We filed a motion for entry of final judgment asking that the listing rule be vacated. So you told the Fish and Wildlife then what you're saying now should have been done. We told, Your Honor, we told the district court, Judge Bolton, that. Judge Bolton, in response to opposition that was filed by Defenders of Wildlife -- by the way, the government agreed with us. Defenders of Wildlife argued, no, you should keep the species listed and simply remand it back to the agency. And I can't remember where it came from. It may have been from Defenders of Wildlife. It may have been that the judge did it on her own. But her order allowed, expressly allowed the Fish and Wildlife Service to consider additional information past March of 1997. So we ended up with this mismatch. So the bottom line is, and with respect to mootness, and I want to go on and address the genetic test and a couple of the other tests in a second. My point is this. There are a lot of --- in a normal mootness situation, you're looking out there and you can see that something's likely to happen within a fixed time period. There's still a lot of moving parts in this case, however. It's not a typical mootness situation. We don't know what would happen if you remanded this case back. And again, we're looking at a good 18 months to two years before any final decisions made. The final point, very briefly, the petition to list doesn't ask to relist the same species unit. It asks in the alternative to relist the Arizona population, something called the Sonoran Desert biome population, or just the entire western population. And the 90-day finding reflects that and, unfortunately, doesn't give you any indication which direction that's going to go. It also asks that an entirely different species be listed, Brazilianum ridgewayi, which is not a recognized species. So, again, I don't want to get too bogged down in that, Your Honors, but there are a lot of moving parts. We don't know how this is ultimately going to come out. Let me briefly talk about what I call the red herring of Dr. Proudfoot's study. Dr. Proudfoot's study, which was ultimately published. What year are we talking about? Are we talking about? I'll get. Yeah. What I was talking about was the two. He did a study, 2004, 2005, was ultimately published in 2006. That 2006 study is in the excerpts of record. I'm not sure whether it was actually in the administrative record, but it's reproduced. I think it begins on page 112 of the excerpts, the defender's excerpts of record. But at the end of the day, that study doesn't stand for the proposition that defenders is trying to make it stand for. What it says is that pig meows, when you boil it down, pig meows in southern Arizona, Sonora and Sinaloa, that's a range of some 600 or 700 miles, are genetically similar. So we suspected all along. In fact, in the initial action, we didn't contest the fact that the eastern and western populations are probably dissimilar and probably would qualify as separate distinct population segments. That was never the issue. Because they are separated, there probably was over time some genetic differences that evolved. But what Proudfoot's study says is if you go down 600 miles or more into Mexico, pig meows are genetically the same, as you would expect, because there is no physical barrier. So when you apply the factors under the significance criteria, and I realize I'm out of time, let me just sum up by doing this. If you look at each of the significance criteria, Your Honor, is the population segment or let me quote it exactly, does the population segment differ markedly from other populations of the species and its genetic characteristics? No. There are thousands of pig meows in Sinaloa and Sonora with the same genetic characteristics. Does it create a gap in the range by reducing the genetic variability of the taxon? Again, no. There are thousands of pig meows in northwest Mexico that are, according to Dr. Proudfoot, identical genetically. If you look at the other criteria, is there a reduction in the current or historic range? No, there isn't, because Arizona is such a tiny piece of the overall taxon's range, and we're all in agreement that there are probably 40 or 50 pig meows in southern Arizona. And finally, on the unique setting, again, it's similar to the genetics, Your Honors. The Sonoran Desert extends from south-central Arizona south a distance of 400 miles. The bulk of the Sonoran Desert is in Sonora. There are thousands of pig meows in Sonora. Our experts estimate that somewhere between 70% and 80% of the habitat currently occupied by pig meows is in Sonora. So if that's the case, how does the population in Arizona, and, again, the issue here is does Arizona Counsel, you're well over your time. You may wish to sum it up. With that, Your Honor, I agree with the government. You should affirm the decision below. Thank you. Thank you. And I apologize for going over. Mr. Rylander. Thank you, Your Honor. A couple of quick points. The 12-month finding under the Endangered Species Act, just to clarify something, is a 12 months from the time that the petition was submitted, which was in March of 07. So we're actually already beyond 12 months, but beyond that, everything else that's been stated is correct, that it could take up to two years or however long to determine listing. The 2006 delisting took place even though the service had available to it all of Dr. Proudfoot's research. As the government has indicated, that research was similar to studies that he had published in 2001. It was similar findings that were submitted to the service in 2005. The study that I quoted to you from 2006 was ultimately part of the record because they had received a copy of it in 2005. And the record says as well that, and this is at page 2012, in a memo from the regional director to the field supervisor to the regional director highlighting potentially controversial issues, it notes that the service did not consider alternative DPS configurations, they did not consider the original intent of the DPS policy, and they did not wait for the publication of Dr. Glenn Proudfoot's research, which they had before it. But we did tell them specifically or we told the district court to tell them that they should compare the Arizona pig-me-owl to that of the northwestern Mexican pig-me-owl, and that's what they did. How could that be, how could that conduct by Fish and Wildlife be characterized as arbitrary and capricious when they did what I understand to be precisely what the panel told them? I understand your question, Judge Pro. The fundamental issue in that case was that the Fish and Wildlife Service in the 1997 listing rule did not make any effort to compare the Arizona population to Mexico really at all. And in saying that the service needed to look at the difference between Arizona and northern Mexico, that is true. But they also had to, and the Ninth Circuit indicated this, look at the taxon as a whole. And if you could conclude solely from analysis of owls across the border that there was no impact on the taxon as a whole, perhaps it wouldn't be arbitrary. But comparing the attributes of, you know, counsel on one side of the table to counsel on the other side of the table might tell you something about us, but may not say anything about lawyers generally that practiced before the Ninth Circuit. You have a situation where the owls are genetically distinct from Texas, from the eastern population, from the southern western population, and only have similarities, although there's some evidence in the record that there's some genetic divergence occurring as well in Sonora. Only have similarities right there. When you look at the taxon as a whole, I think this goes to the level of degree of scrutiny that the service has to apply when it considers significance. Significance in the policy is supposed to mean its common ordinary meaning. In the last case, NHB case before this Court, the Court indicated that that meant important, yet in Northwest Ecosystems the Court said that significant meant notable. If you look at the definition of significance, it more often than not contains phrases like significant deviation or statistical significance, which refer more to something that is noticeable and not attributable to chance. If the significance criteria is ratcheted up to such a level of scrutiny that 15 percent of the historic range of a species can be lopped off or an owl that occupies an unusual habitat area for, you know, compared to 80 percent of the population is no longer significant. I think you've taken that policy beyond the intent of the Endangered Species Act and beyond the intent of the drafters of the policy when it was promulgated. I'm out of time. I did want to just note that with respect to Northwest Ecosystems, I think we covered this in the reply brief, they made a facial argument. We have not made a facial argument. The counsel was trying to make us argue something that we're not. It also, that case did not address the issue of a species that is found abroad. The Washington gray squirrel was a domestic population that was compared against other domestic populations, and so the issue of international significance versus United States significance is not. But the opinion didn't speak to the international aspect of it. It talked about the gray squirrel in California, Nevada, Oregon, and Washington. Exactly. And we do not dispute that the service can look at some level of significance. It's a question of how rigidly they apply that and whether that's consistent with Congress' intent to protect the biodiversity of the nation. Thank you for your time. Thank you, Mr. Ronder. We thank both counsel for the argument. Court stands in recess until tomorrow.
judges: Bybee, Bea, Pro